R. A. CALDWELL, Plaintiff,

v.

GURLEY REFINING COMPANY, William M. Gurley, Larry M. Gurley, United States Environmental Protection Agency, Douglas M. Costle, Administrator of the United States Environmental Protection Agency and Neil Goldschmidth, Secretary of the United States Department of Transportation, Defendants.

No. J–C–79–101.

United States District Court,
E. D. Arkansas,
Jonesboro Division.

Feb. 11, 1982.

---

Charles R. Nestrud, House, Holmes & Jewell, Little Rock, Ark., for plaintiff.

Rieves, Rieves & Shelton, West Memphis, Ark., for Gurley Refining Co., William M. Gurley and Larry M. Gurley.

Diane S. Mackey, Ass't U. S. Atty., Little Rock., Ark., Judson W. Starr, U. S. Dept. of Justice and Natural Resources, Division, Environmental Enforcement Sec., Washington, D.C., and Charles G. Field, U. S. EPA, Washington, D. C., for defendants.

## MEMORANDUM ORDER

WOODS, District Judge.

This case is before us on the defendant Environmental Protection Agency's motion to dismiss. The facts set forth in the complaint, which for purposes of this motion we accept as true, allege that the plaintiff R. A. Caldwell owns a tract of land in Crittenden County, Arkansas which he has leased to the defendant Gurley for purposes of waste disposal. Prior to entering into the lease, Gurley was notified by the Arkansas Department of Pollution Control and Ecology (PC&E) that it was illegally discharging oily substances into the State's waters.

PC&E accordingly issued a cease and desist order and required the company to submit plans for an acceptable disposal system. These plans, which included use of Caldwell's property, were conditionally accepted by PC&E in June of 1970 and a permit was issued. From October of 1970 through January of 1978, numerous complaints were received concerning the discharge of oily wastes, and in May of 1975 the company was found guilty of polluting the State's waters by the Municipal Court in West Memphis, Arkansas. It appeared that the company had attached discharge pipes to the pit located on the plaintiff's property and that waste material was running through the pipes into the 15 mile Bayou. Again PC&E directed the defendant to develop a plan for the pit. Gurley responded by trying to return the pit to the plaintiff. The plaintiff, however, refused to assume responsibility for the pit and would not accept advance payment of rent. In September of 1975 Gurley Company's engineer submitted further plans, which were again conditionally accepted provided that a method for preventing overflow was developed. Gurley's plans to discontinue use of the pit were approved by PC&E as long as the plans incorporated the engineer's recommendations and PC&E's conditions. This approval did not, however, end the problems surrounding the disposal pit. In January, 1976 more complaints were received and Gurley again attempted to turn the pit over to the plaintiff. Finally in February of 1976 Gurley notified the plaintiff that the overflow problem had been solved and that PC&E was satisfied. Having received this assurance, the plaintiff accepted Gurley's check for the advance payment of rent. The plaintiff was, however, unaware that PC&E had recently contacted Gurley about further problems with the pit. Another two years passed, and in January of 1978 PC&E discovered more overflow from the pit. At this time PC&E contacted the EPA to require Gurley to obtain a National Pollution Discharge Elimination System permit. There was no response to this request until July of 1973 when the EPA notified both Caldwell and

Gurley that federal action would be taken to correct the overflow if either the plaintiff or Gurley failed to solve the problem. In July of 1978 Gurley began clean-up operations which were soon discontinued. The EPA then proceeded to correct the situation. In 1979 after the EPA completed the initial cleanup, more oil was discharged from the pit. Since Gurley refused to conduct any clean-up operation, the EPA drained the pit and installed a permanent drain and skimmers. Bids for the final closing of the pit were solicited by the EPA. These bids ranged from $700,000.00 to $900,000.00.

These facts give rise to the plaintiff's suit against both Gurley Refining Company and the Environmental Protection Agency. Count I of the complaint requests an injunction ordering Gurley to comply with the Federal Water Pollution Control Act and an injunction ordering the EPA to enforce the FWPCA. Jurisdiction is to be obtained through 33 U.S.C. § 1365, which reads as follows:

(a) Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the administrator or a State with respect to such a standard or limitation, or

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title.

In Count II the plaintiff requests that the Court proceed under the Declaratory Judgment Act and determine the plaintiff's liability for the clean-up undertaken by the EPA.

The third count of the complaint is addressed only to the defendant Gurley and seeks specific performance of the lease agreement and damages.

■ At this point we are primarily concerned with the allegations directed against the EPA. It is that agency's contention that the action against it should be dismissed for failure to state a claim for which relief can be granted. This argument is based upon the language of 33 U.S.C. § 1365 which authorizes a citizen's suit against the EPA where the Administrator has failed to perform a non-discretionary function. 33 U.S.C. § 1365(a) specifically states that the court has jurisdiction to order the Administrator to act in compliance with the enforcement section of the statute. 33 U.S.C. § 1319 provides in pertinent part:

Whenever on the basis of any information available to him the Administrator finds that any person is in violation of section 1311, 1312, 1316, 1317, 1318, 1328, or 1345 of this title, or is in violation of any permit condition or limitation implementing any of such sections in a permit issued under section 1342 of this title by him or by a State or in a permit issued under section 1344 of this title by a State, he shall issue an Order requiring such person to comply with such section or requirement, or he shall bring a civil action in accordance with subsection (b) of this section. § 1319(a)(3).

In response to the EPA's motion to dismiss, the plaintiff claims that since the EPA has found Gurley to be in violation of the FWPCA and the agency must either issue an abatement order or file a civil action to obtain relief. On the other hand, the EPA claims that the issuance of an abatement order or the filing of a civil suit is a discretionary duty and therefore may not proper-

ly be the subject of a citizen's suit according to the language of 33 U.S.C. § 1365(a)(2).

The few cases which have addressed this issue appear to be directly in conflict. In *South Carolina Wildlife Federation v. Alexander*, 457 F.Supp. 118 (S.C.1978) the court determined through a careful analysis of legislative history that the Administrator did indeed have a mandatory duty to issue an abatement order where violations of the act had been found. See also *Illinois v. Hoffman*, 425 F.Supp. 71 (S.D.Ill.1977); *United States v. Phelps Dodge Corp.*, 391 F.Supp. 1181 (D.Ariz.1975).

While the interpretation of 33 U.S.C. § 1365(a) and 33 U.S.C. § 1319 is by no means free from doubt, we conclude that the approach taken by the Fifth Circuit in *Sierra Club v. Train*, 557 F.2d 485 (5th Cir. 1977) is correct. In that case the Sierra Club filed a citizen's suit under 33 U.S.C. § 1365 requesting that a writ of mandamus issue directing the EPA to enforce FWPCAA as required by 33 U.S.C. § 1319(a)(3). The District Court held that it lacked jurisdiction since the plaintiffs were trying to compel the Administrator to perform a discretionary duty. The appellate court agreed with this determination and in doing so presented the following discussion of the statute:

> Even during the legislative stage, dissension existed over whether § 1319(a)(3) created a discretionary or non-discretionary duty. The discord is evidenced by the distinction between the Senate version and the House version of the bill:
>
> Senate Bill
>
> Section 309 *requires* the Administrator ... to issue a compliance order or to bring a civil suit against the pollutor.
>
> \* \* \* \* \* \*
>
> [T]he section *requires* him to either issue an order that requires immediate compliance or to bring a civil suit.... If such an abatement order is not complied with, the Administrator would initiate a civil suit for appropriate relief, such as an injunction.
>
> \* \* \* \* \* \*

> House Amendment
>
> Section 309 is basically the same as the Senate bill except that the Administrator is *authorized* rather than required to initiate civil actions or criminal proceedings....
>
> Conference substitute
>
> This is the same as the House Amendment.

H.R.Conf.Rep. No. 92–1465, 92d Cong., 2d Sess. (1972), *reprinted* in House Comm. on Pub. Works, 93rd Cong., 1st Sess., Laws of the United States Relating to Water Pollution Control and Environmental Quality (1973).

The Sierra Club has contended that while the House amendment did remove the mandatory aspect of the EPA Administrator's duty to bring suit, the duty to issue a compliance order remained mandatory. The Sierra Club theorizes that since the duty to issue an abatement order was mandatory in the Senate bill, since the House amendment spoke only to the Administrator's duty to commence suits, and since the Conference substitute incorporated the House amendment, this duty retained its mandatory character. Whether the Senate bill imposed a mandatory duty is, however, unclear. Although, according to one portion of Senate Report No. 92–414, "the section requires him to either issue an order that requires immediate compliance or to bring a civil suit," [1972] U.S.Code Cong. & Admin.News, pp. 3668, 3809, another portion of that same Senate Report states: "The task of enforcing provisions of the bill is assigned to the Administrator.... [T]he Administrator may issue an order to comply or go to court against the violator." [1972] U.S.Code Cong. & Admin.News, pp. 3668, 3677. The Discussion of Intent contained in the same Senate Report was quite explicit on the subject:

> The Committee again, however, notes that the authority of the Federal Government should be used judiciously by the Administrator in those cases

[which] deserve Federal action because of their national character, scope, or seriousness. . . . It is clear that the Administrator is not to establish an enforcement bureaucracy but rather to reserve his authority for the cases of paramount interest.

[1972] U.S.Code Cong. & Admin.News, pp. 3688, 3730. The quoted portions demonstrate that the Senate Report cannot be relied upon as conclusive evidence that the Senate intended the § 1319(a)(3) duty to be mandatory. Because of this inconclusiveness, the blank spaces in the Sierra Club theory are apparent.

The Sierra Club further attempts to support its theory by claiming that § 1319(b) provides only that the initiation of a civil suit is a discretionary duty while § 1319(b) does not address the issue of whether or not the issuance of compliance order is a non-discretionary duty. An examination of the statute itself will reveal the fallacy of this purported logic. Section 1319 provides:

> (a)(3) Whenever on the basis of any information available to him the Administrator finds that any person is in violation of [the FWPCAA] . . ., he shall issue an order requiring such person to comply with such section or requirement, or he shall bring a civil action in accordance with subsection (b) of this section.

> \*   \*   \*   \*   \*   \*

> (b) The Administrator is *authorized* to commence a civil action for appropriate relief, . . . for any violation for which he is *authorized* to issue a compliance order under subsection (a) of this section. (emphasis added).

A statute must be examined in light of the words and structure of the act in order to determine the legislative intent and the true meaning of the statute. *Exxon Corp. v. Train*, 5 Cir. 1977, 554 F.2d 1310. Section 1319, especially subsection (b)'s statutory language "is authorized," clearly demonstrates the discretionary flavor of the statute. 489–90.

While we are in agreement with the court's analysis of the legislative history and its interpretation of the statute, we are particularly impressed with the court's determination that a practical assessment of the statute and its functions requires the conclusion that the Administrator's acts are discretionary. With regard to this issue, the court stated:

> Proper statutory construction requires more than linguistic examination and review of the rules of statutory construction. The interpretation should be reasonable, and where the result of one interpretation is unreasonable, while the result of another interpretation is logical, the latter should prevail. C. Sands, Sutherland's Statutory Construction § 45.12 (4th ed. 1973); *See Rosado v. Wyman*, 397 U.S. 397, 414–15, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); *United States v. St. Regis Paper Co.*, 2 Cir. 1966, 355 F.2d 688.

> Reason would dictate that the duties prescribed by § 1319(a)(3) be found discretionary. Since the Administrator *at his discretion* may bring suit, concluding the Administrator's duty to issue an abatement order to be mandatory would be unreasonable. For example, if the Administrator did issue an abatement order which was not complied with and the Administrator did not commence a suit for failure to comply, the empty gesture of issuing an abatement order would not foster the FWPCAA's goal of pollution elimination. The citizen's alternative would be to file a suit to enforce the FWPCAA effluent limitation standards, but this right exists in the absence of the issuance of a compliance order by the Administrator. The citizen possesses the same right under the FWPCAA with or without issuance of a compliance order to bring suit against and receive damages from an alleged pollutor. In the quest to eliminate pollution a compliance order by the Administrator is unnecessary. On the other hand, the issuance of orders which the Administrator does not intend to pursue in court would be an exercise in practical futility, undermining the prestige and the effectiveness of the EPA. 490–91.

We find the above-quoted paragraphs to be particularly applicable where, as here, the Administrator chose a form of action not contained in 33 U.S.C. § 1319, that is, an immediate clean up of the area under 33 U.S.C. § 1321. Were the Administrator required to issue an abatement order prior to the commencement of clean-up operations, valuable time would obviously be lost as the order was processed and appealed through various administrative channels. Furthermore, the very fact that a third alternative to the issuance of an abatement order or the filing of a civil suit exists, indicates that Congress did not intend to mandate the Administrator in all cases to seek such an order or file such a suit. Accordingly, we find that this Court does not have jurisdiction over the plaintiff's suit against the EPA brought pursuant to 33 U.S.C. § 1365(a)(2).

Even though we can find no statutory jurisdiction under 33 U.S.C. § 1365(a)(2), the plaintiff would have us retain the case under federal question jurisdiction or the Declaratory Judgment Act.

■ Clearly, the Declaratory Judgment Act does not confer jurisdiction on this court. *Skelly Oil Co. v. Phillips Petroleum*, 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950). Therefore, we must find independent grounds for jurisdiction if we are to retain this case. Although the complaint alleges federal question jurisdiction under 28 U.S.C. § 1331, we conclude that the requirements of 33 U.S.C. § 1365 must be met and that 28 U.S.C. § 1331 does not give the plaintiff an alternative procedure for conferring jurisdiction. *South Carolina Wildlife Federation v. Alexander, supra.* Since we have found that we do not have jurisdiction of the plaintiff's complaint against the EPA, the EPA's motion to dismiss is granted and the plaintiff's motion for partial summary judgment is denied.